CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

March 25, 2024
LAURA A. AUSTIN, CLERK
BY: /s/T. Taylor
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| CECIL GUY TRUMAN,  )<br>     )<br>     Plaintiff,  )<br>     )<br>v.   )   Civil Action No. 7:22-cv-00570<br>     )<br>SHRADER, *et al.,*  )   By: Elizabeth K. Dillon<br>     )       United States District Judge<br>     Defendants.  ) | |

## MEMORANDUM OPINION

Plaintiff Cecil Guy Truman, a Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983 against five defendants employed by the Virginia Department of Corrections. On September 27, 2023, the court issued an opinion and order granting a motion to dismiss filed by two of the defendants, identified in the complaint as Lokey and Clifton. (Dkt. No. 54.) Now before the court are motions for summary judgment filed by the three remaining defendants: Russo and Shrader filed a joint motion, and Dr. Smith filed a separate motion. (Dkt. Nos. 41, 45.) Plaintiff filed responses to both motions (*see* Dkt. Nos. 44, 49) and also filed a motion to appoint counsel after the motions were fully briefed (Dkt. No. 56).

For the reasons stated below, the summary judgment motions will be granted and the motion to appoint counsel will be denied.

## I. BACKGROUND

### A. Russo and Shrader

#### 1. Relevant allegations

During the relevant time of the complaint, Truman was a VDOC inmate housed at Augusta Correctional Center (ACC). Shrader was a Lieutenant, and Russo was a Sergeant.

Pertaining to Shrader and Russo, Truman alleges that they used force against him on two separate occasions on May 10, 2022. First, Truman alleges that during a cell and strip search, either Shrader or Russo "grabbed [Truman's] penis and jerked it upward with violence and force." (Compl. at 3, Claim #1, Dkt. No. 1.) And in his second claim, Truman alleges that after one of the defendants touched his genitalia, Truman got dressed, was handcuffed, and then was taken out of his cell where either Shrader or Russo "looped his arms through [plaintiff's] to leverage [Truman's] arms upward." The other officer (either Shrader or Russo) "joined him by also looping his arm through [Truman's] and as both officers lifted [Truman] it created tremendous pressure on [plaintiff's] back, shoulder, and wrist." (*Id.* at 4, Claim #2.)

Truman alleges that the conduct described in these two counts was "assault and battery" and violates the Eighth Amendment.

### 2. Exhaustion of administrative remedies

Operating Procedure (OP) 866.1, Offender Grievance Procedure, is a mechanism for offenders to resolve complaints, appeal administrative decisions, and challenge the substance of procedures. The process provides corrections administrators with a means to evaluate potential problem areas and, if necessary, correct those problems. (Canterbury Aff. ¶ 4, Dkt. No. 42-1.)[1] Each inmate is entitled to use the grievance procedure for problem resolution. (*Id.* ¶ 5.)

Pursuant to OP 866.1, an inmate properly exhausts his administrative remedies by timely filing a regular grievance at the institutional level and appealing that regular grievance through all levels of review. (Canterbury Aff. ¶ 6.) Prior to filing a regular grievance, an inmate must demonstrate that he has made a good faith effort to informally resolve the complaint by using the Informal Complaint process. This involves an inmate submitting a verbal complaint and an Informal/Written Complaint. After an inmate lodges a verbal complaint, and if the issue remains

---

[1] Canterbury is the Alternative Grievance Coordinator at Augusta.

unresolved or the inmate is not satisfied with the resolution, the inmate may file an Informal/Written Complaint. (*Id.* ¶ 7.)

An Informal/Written Complaint must be filed within 15 days of the incident or discovery of the incident. Institutional staff then have 15 days to respond. (Canterbury Aff. ¶ 8.) If an inmate is dissatisfied with the staff's response, the inmate can file a Regular Grievance after the passage of 15 days. (*Id.* ¶ 9.) Regular Grievances are to be submitted within 30 calendar days of the incident. (*Id.* ¶ 10.)

If an inmate raises an issue of sexual harassment or sexual assault, this is considered a Prison Rape Elimination Act (PREA) issue and any regular grievance filed about such sexual assault or harassment cannot be rejected at intake. (Canterbury Aff. ¶ 14.)

### 3. Truman's use of the grievance procedure

Ms. Canterbury reviewed Truman's Grievance File for grievances related to Truman's allegations against Lt. Shrader and Sgt. Russo. (Canterbury Aff. ¶ 15.) Based on this review, Canterbury determined that Truman exhausted his claim that either Shrader or Russo sexually assaulted him on May 10, 2022. (*Id.* ¶ 16.) However, Truman did not file any informal complaints or regular grievances about Shrader and Russo lifting Truman off the ground and hurting his back. (*Id.* ¶ 17.)

## B. Dr. Smith

### 1. Relevant allegations

Plaintiff alleges Dr. Smith covered up his injuries to protect the officers that allegedly assaulted him; that Dr. Smith cannot properly treat him because Dr. Smith does not believe the injuries occurred as described by plaintiff; that Dr. Smith knew his neck and shoulder were injured but still refused to treat him; and that Dr. Smith generally denied him medical treatment. (Compl at 6.)

3

## 2. Medical treatment

Dr. Smith is a Board-certified physician licensed to practice medicine in Virginia. He completed his residency training in family medicine in 2015 and has practiced primary care medicine since that time. Since 2018, Dr. Smith provides primary care services to inmates at the ACC and is the Medical Director at this facility. (Smith Decl. ¶ 1, Ex. A, Dkt. No. 46-1.)

On May 10, 2022, Truman was brought to the Medical Unit by security officers, and he was examined by a staff nurse. (*Id.* ¶ 7.) He reported neck pain, described by the nurse as cervical to mid-thoracic, "when security 'pulled my arms over my head.'" Upon examination, she found no signs of trauma or injury, and concluded there was no contraindication to his placement in the restricted housing unit. (*Id.*) Ibuprofin at 200 mg twice a day for five days was authorized. (Ex. B, Dkt. No. 46-2, SA 026.)

Truman was again seen in the Medical Unit on May 18 by a staff nurse for complaints of upper back and lower neck pain. He reported that when he was handcuffed behind his back, officers lifted his arms up and he heard a "pop" in his neck. On exam, he reported pain when lifting his arms, bending, and sitting up straight. An ex-ray of Truman's spine was ordered. (Smith Decl. ¶ 8, SA 026, 027.) The x-rays were interpreted by an outside radiologist, Dr. Steven Wiebe-King, who determined that the x-rays were negative for thoracic spine. (Smith Decl. ¶ 9, SA 028, 029.) The cervical films showed disc space narrowing and endplate spurring which is consistent with arthritis. (Smith Decl. ¶ 9, SA 028, 029.) The findings were chronic in nature and not as a result of his alleged mistreatment. Documentation therefore indicated this as "clinically insignificant. (Smith Decl. ¶ 9, SA 030.)

Truman then was seen in the clinic on May 27. He reported that he was unable to sit up straight and had pain lifting his arms above his neck as well as pain turning his neck in either direction. The nurse ordered ibuprofen 200 mg twice a day for five days and placed him on the

list to be seen by Dr. Smith due to his recurring complaints. (Smith Decl. ¶ 10, SA 031.) Truman did not show up for his next visit that was scheduled for June 7. (SA 032.)

On June 13, 2022, Truman was seen by a nurse at the Medical Unit for the same complaints. He reported that he could hear/feel grinding in his neck with every movement and that the Ibuprofen was helping. The Ibuprofen was renewed, and he was placed on the list to see Dr. Smith. (Smith Decl. ¶ 11.)

Dr. Smith first saw Truman on June 26, 2022. (*Id.* ¶ 11.) Truman reported that he had pain in his neck and running down his left arm. He claimed all of this started last month with the incident wherein he was handcuffed and his arms were raised. Plaintiff denied a prior history of neck and/or arm pain. Dr. Smith noted that Truman was vague and evasive about the nature of his symptoms. (SA 034.)

Dr. Smith conducted a thorough physical examination of Truman. Dr. Smith documented that a neurological examination showed that Truman was alert and oriented in all spheres. He had normal upper extremity tone and bulk, and, in both arms, strength was 5/5 across the wrist, shoulders, and elbows which was normal. He had normal strength in the hands. Sensation was intact. His neck and spine were normal to inspection and palpation. While the spurling test (to assess for nerve root entrapment) was arguably positive, Truman gave a cry of pain before Dr. Smith even pushed down on his head. As such, Dr. Smith did not believe the results were truly positive. Dr. Smith reviewed the radiology studies that had been previously taken and noted the chronic degenerative changes. Dr. Smith also noted that there was no evidence of an acute injury. Dr. Smith concluded that Truman's discomfort was from the arthritis and prescribed him a new anti-inflammatory, Naproxen 440 mg, that was a bit stronger to try twice a day for 14 days as needed. (Smith Decl. ¶ 12.)

Truman returned to the Medical Unit and was seen by a nurse on July 7. He continued to report neck pain between his shoulder blades as well as left shoulder pain. The nurse documented that he was still taking Aleve (the brand name for Naproxen). (SA 035). Two days later, Truman was seen by another nurse. He reported that officers "jacked" him up during escort to RHU in May, specifically mentioning that he was injured while wearing handcuffs. Truman was found to have no deficits other than subjective complaints of pain. He was able to lift his arm to the front and side with pain subjectively reported as 10/10. The nurse referred Truman to Dr. Smith. (Smith Decl. ¶ 14.)

Truman saw Dr. Smith for the second time on July 13, 2022. (SA 037.) Truman reported severe neck and shoulder pain due to being "jacked up and manhandled" when he was handcuffed. Truman had no new complaints since his first visit to Dr. Smith. Truman wanted to know if his injuries would "ever heal" or if he was going to have "permanent complications." Dr. Smith reviewed Truman's medication administration record and saw that plaintiff had only taken the ordered Naproxen five times out of a total of 28 available doses. Dr. Smith's physical exam of Truman revealed that he was not in acute distress and he was alert and oriented in all four spheres. He had grossly normal range of motion in the left shoulder. Dr. Smith noted that prior x-rays had revealed degenerative joint disease and that his last exam had been reassuring. Based on his physical exam, radiological findings, and all available data, Dr. Smith suspected malingering. Nonetheless, out of caution, Dr. Smith planned to obtain an x-ray of Truman's left shoulder, provided patient education, and discussed expectations. They also discussed a shoulder exercise handout. (SA 037.)

Truman was seen again in the clinic on August 17 by a staff nurse with the same complaints. Truman had done some bench pressing and had pain and discomfort in his head

with range of motion. Arm range of motion reported a pain level of 6/10. Ibuprofen was prescribed, and the nurse referred Truman to Dr. Smith. (Smith Decl. ¶ 18, SA 040.)

Dr. Smith's third visit with Truman took place on August 22, 2022. (Smith Decl. ¶ 19.) Plaintiff reported that he was experiencing neck pain and stated that he had hurt it recently while bench-pressing. He said he felt pain at the time and that the pain had persisted for a few days after. He denied weakness, numbness, or apraxia. There was no trauma to the area. Dr. Smith conducted a physical examination which revealed that Truman was not in acute distress. There was slight cervical kyphosis present (atypical curvature of the spine), but the cervical spine was not tender to palpation. Both lower extremities and upper extremities had 5/5 strength, which was normal. Based on the history reported and objective physical findings, Dr. Smith concluded that he had a mild exacerbation of his chronic neck pain due to the degenerative joint disease. Dr. Smith discussed avoiding exacerbating factors with Truman and instructed him to obtain over-the-counter analgesics from the commissary. Truman became upset and said he was going to "check into it." (Smith Decl. ¶ 19; SA 041.)

Then, plaintiff was seen in the Medical Unit on September 28, 2022, by one of the nurses, this time a chief complaint of pain 8/10 to the cervical area with any kind of movement to the neck or head or with turning in bed. Examination revealed no swelling or discoloration. Truman wanted a neck brace, and the nurse put in an order for Ibuprofen and for Dr. Smith to evaluate him regarding the neck brace. (Smith Decl. ¶ 20; SA 043.) On the same day, Dr. Smith discussed the findings with the nurse, documenting that Truman's condition did not warrant a physician referral because he had been seen for these issues on August 22 with a reassuring exam. Dr. Smith also documented that there was no indication for a neck brace at that time. (SA 042.)

On or around December 6, 2022, Truman was transferred from ACC to the Baskerville Correctional Center. Dr. Smith had not seen Truman again for neck or shoulder issues prior to his departure. The ACC records also do not reveal any further visits to the Medical Unit for issues related to his neck or shoulder prior to Truman's transfer. (Smith Decl. ¶ 22.)

Truman's medical records at Baskerville reveal that Truman continued medical visits regarding his complaints of back and neck pain. The providers at Baskerville similarly documented no acute injury and counseling for strength exercises and the use of anti-inflammatory medication. (*See* SA 052–55.) At one visit, Truman objected that he could afford to purchase ibuprofen and he wanted to be able to carry Naproxen "on his person" like another inmate did in his building. The nurse practitioner denied Trumans' request for Naproxen, and Truman became belligerent. (SA 055.)

## II. ANALYSIS

### A. Motion to Appoint Counsel

While there is no constitutional right to appointed counsel in a civil case, the court may exercise its discretion to appoint counsel for an indigent person in a civil action, 28 U.S.C. § 1915(d); *see Smith v. Blackledge*, 451 F.2d 1201, 1203 (4th Cir. 1971). The Fourth Circuit has stated that counsel should be appointed only in exceptional circumstances, which "will turn on the quality of two basic factors—the type and complexity of the case, and the abilities of the individuals bringing it." *Brock v. City of Richmond*, 983 F.2d 1055 (4th Cir. 1993). The issues presented by this case and by the summary judgment motions are not complex. Also, the court notes that Truman has demonstrated the ability to adequately litigate this case by bringing this action on his own behalf and by filing motions and responses to defendants' filings. Accordingly, Truman's motion to appoint counsel will be denied.

## B. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25. Although all justifiable inferences are to be drawn in favor of the non-movant, the non-moving party "cannot create a genuine issue of material fact through mere speculation of the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

The court is charged with liberally construing complaints filed by *pro se* litigants, to allow them to fully develop potentially meritorious cases. *See Cruz v. Beto*, 405 U.S. 319 (1972); *Haines v. Kerner*, 404 U.S. 519 (1972). At the summary judgment stage, however, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be

9

tried. *See Chisolm v. Moultrie*, C/A No. 4:21-03506-BHH-TER, 2023 WL 3631798, at *1 (D.S.C. May 2, 2023). A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

## C. Eighth Amendment

The Eighth Amendment protects prisoners from "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). That protection imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of . . . inmates." *Whitley*, 475 U.S. at 320. Some Eighth Amendment violations constitute "deliberate indifference," while others constitute "excessive force." *Id.*; *Thompson v. Commonwealth of Va.*, 878 F.3d 89, 97 (4th Cir. 2017). The deliberate indifference standard generally applies to cases alleging failures to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, or failing to render medical assistance. *See Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994); *Wilson v. Seiter*, 501 U.S. 294, 303 (1991).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer*, 511 U.S. at 834–37; *Heyer v. United States Bureau of Prisons*, 849 F.3d 209–10 (4th Cir. 2017). Objectively, the medical condition at issue must be serious. *Hudson*, 503 U.S. at 9. "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

10

After a serious medical need is established, a successful claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 842. "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999). Indeed, "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016).

**D. Exhaustion under the Prison Litigation Reform Act (PLRA)**

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). A prisoner must exhaust all available administrative remedies, whether or not they meet federal standards or are plain, speedy, or effective, and even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks. *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2005).

Ordinarily, an inmate must follow the required procedural steps to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). An inmate's

11

failure to follow the required procedures of the prison administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). Exhaustion serves "two main purposes." *Woodford*, 548 U.S. at 89. First, the exhaustion requirement "protects administrative agency authority" by allowing the agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." *Id.* Second, "exhaustion promotes efficiency" because "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.* But the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Shipp v. Punturi*, Civil Action No. 7:21cv00414, 2023 WL 7125259, at *3 (W.D. Va. Oct. 30, 2023) (citing *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007)). Accordingly, an inmate need only exhaust "available" remedies. § 1997e(a). An administrative remedy is not available "if a prisoner, through no fault of [her] own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

### E. Shrader and Russo

#### 1. Exhaustion

As noted, Shrader and Russo concede that Truman exhausted his claim that one of them sexually assaulted him on May 10, 2022. However, Shrader and Russo argue they are entitled to summary judgment on Truman's claim that they lifted Truman outside of his cell and injured his back because Truman did not utilize the grievance procedure for this claim. *See, e.g.*, *Tracey v. Kirkland Corr. Inst.*, Civil Action No. 1:12-cv-01614-JMC, 2013 WL 3049410, at *4 (D.S.C. June 17, 2013) (finding that defendant is entitled to summary judgment on exhaustion issue

12

where "a review of Plaintiff's grievance history reveals no grievances filed before the initiation of this litigation").

In response, Truman argues that the sexual assault that occurred inside his cell and the assault that occurred outside the cell are same incident for purposes of exhaustion. (Dkt. No. 44 at 3.) The claims must be considered separately, however, because Truman explicitly alleges that only one of the defendants sexually assaulted him, while both Shrader and Russo are alleged to have picked him up by looping their arms under each of Truman's arms. Truman did not grieve anything related to shoulder and neck injuries, and this claim cannot be deemed exhausted simply because it occurred right after the incident that he did exhaust. *See, e.g.*, *Van Johnson v. Ayers*, No. 12-cv-31 (WLS), 2013 WL 149583, at *1 (M.D. Ga. Jan. 14, 2013) (construing allegations as "separate claims for relief" and concluding that plaintiff "failed to exhaust all claims except his knee-replacement claim" because "the PLRA requires exhaustion of prison-grievance procedure and Plaintiff mentioned only the denial of knee surgery in his prison-grievance filings").

Therefore, Shrader and Russo are entitled to summary judgment on Truman's claim that they assaulted him outside his cell.

**2. Eighth Amendment claim**

As for Truman's claim that either Shrader or Russo assaulted him by grabbing his genitalia, this comes under the rubric of an Eighth Amendment excessive force claim. Such a claim has two overriding factors: (1) objectively, the alleged punishment or act is sufficiently serious that it violates contemporary standards of decency; and (2) subjectively, the prison official must have a sufficiently culpable state of mind. *Farmer*, 511 U.S. at 834.

In adjudicating an excessive force claim, the court must consider such factors as the need for the use of force, the relationship between that need and the amount of force used, the extent

of the injury inflicted, and, ultimately, whether the force was "applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "There can be little doubt that sexual abuse is repugnant to contemporary standards of decency, and that allegations of sexual abuse can amount to an Eighth Amendment violation." *Jackson v. Holley*, 666 F. App'x 242, 244 (4th Cir. 2016). Nonetheless, not all alleged incidents of sexual misconduct are objectively, sufficiently serious to constitute a violation of the Eighth Amendment. *See id.* In the context of a sexual assault, a plaintiff "must allege facts on which he could prove that the unwanted touching had some objectively sexual aspect to it; his own subjective perceptions alone that the contact was of a sexual nature are not sufficient." *Lee v. Kanode*, No. 7:20-CV-00305, 2022 WL 4798263, at *5 (W.D. Va. Sept. 30, 2022).

  Plaintiff's allegations are that one of these two defendants touched his genitalia during a cell and strip search. Either Russo or Shrader "grabbed" Truman's penis and "jerked it upward with violence and force." For purposes of the motion, defendants do not dispute Truman's description and version of events as described in the complaint. Instead, defendants argue that Truman's allegations are not sufficiently serious to constitute an Eighth Amendment violation. First, the force was used for the penological purpose of conducting a strip search. The penological purpose of the search, combined with the lack of any allegation or evidence of a long-term injury, demonstrates that the alleged incident was not sufficiently serious to establish an Eighth Amendment violation for excessive use of force. Second, even if Truman interpreted the touching as sexual in nature, there is no evidence or even allegations that defendants "made overtly sexually suggestive remarks or propositioned [plaintiff] in any way, such that it could reasonably be inferred" that the touch "was done in an objectively sexual manner." *Lee*, 2022 WL 4798263, at *5. It was Truman's burden to come forward with such evidence in response to

14

defendants' motion for summary judgment. Thus, defendants are entitled to summary judgment on this claim. *See, e.g.*, *Ellis v. Elder*, No. 7:08-CV00642, 2009 WL 275316, at *3 (W.D. Va. Feb. 4, 2019) (dismissing Eighth Amendment claim where, "other than his own perceptions," plaintiff had "fail[ed] to allege facts indicating that Elder intended the pat down contact as any sort of sexual proposition or harassment"); *Caldwell v. Crossett*, No. 9:09-cv-576, 2010 WL 2346337, at *3 (N.D.N.Y. May 24, 2010) (finding that a claim that a corrections officer grabbed plaintiff's testicles during a pat-frisk causing serious pain around his groin area failed to allege an Eighth Amendment violation); *Mortimer Excell v. Fischer*, Civ. No. 9:08-CV-945 (DNH/RFT), 2009 WL 3111711, at *7 (N.D.N.Y. Sept. 24, 2009) (plaintiff's allegation that an officer "grabbed and squeezed his penis" was a "quick, isolated incident of inappropriate touching that occurred during a search of his person. Such an incident, even if true, does not constitute an Eighth Amendment violation").

### 3. State law claims

Truman's complaint references "assault and battery." Russo and Shrader move for summary judgment on claims arising under state law. To the extent that plaintiff has brought state law claims in addition to Eighth Amendment claims, the court declines to exercise supplemental jurisdiction over those claims. *See* 28 U.S.C. § 1367(c)(3) (providing that the district court may decline to exercise supplemental jurisdiction over a claim if the court "has dismissed all claims over which it has original jurisdiction"). In the "usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). There are no issues of federal policy favoring the court exercising supplemental jurisdiction over these claims, as opposed to the courts of the

Commonwealth of Virginia. This is especially so because it is not entirely clear that Truman intended to bring such claims pursuant to state law merely by referencing the terms assault and battery.[2]

\*\*\*

For these reasons, the court will grant Shrader and Russo's motion for summary judgment as to the Eighth Amendment claims. However, the court will deny the motion with respect to any potential state law claims and dismiss those claims without prejudice.

**F. Dr. Smith**

As detailed herein, plaintiff alleges Dr. Smith covered up his injuries to protect the officers that allegedly assaulted him; that Dr. Smith cannot properly treat him because Dr. Smith does not believe the injuries occurred as described by plaintiff; that Dr. Smith knew his neck and shoulder were injured but still refused to treat him; and that Dr. Smith generally denied him medical treatment. (Compl at 6.) More specifically, Truman alleges that Dr. Smith refused to treat him for pain and immobility when first seeing him on June 26, 2002, and while the x-rays revealed damage to his neck, cervical spine, and shoulder, Dr. Smith did not believe Truman was actually injured. (Compl. at 5, 6.)

The record demonstrates that Truman's pain arose from osteoarthritis, which is a chronic condition. Dr. Smith argues that this condition is not an objectively serious medical need. Courts have held that osteoarthritis and associated pain can qualify as a serious medical need for purposes of an Eighth Amendment claim. *See, e.g.*, *Diaz v. Godinez*, 693 F. App'x 440, 443 (7th Cir. 2017); *West v. Inch*, Case No. 20-20953-CV-ALTONAGA, 2020 WL 7344653, at *3 (S.D.

---

[2] Truman alleges that grabbing his genitalia and lifting him up by looping arms under his shoulders are "assault and battery *that violate my Eighth Amendment rights*." (Compl. at 3 (emphasis added).) This suggests to the court that Truman is not attempting to allege a violation of state law.

16

Fla. July 28, 2020). The court need not consider this part of the analysis, however, because the record establishes that Dr. Smith was not subjectively reckless in treating that condition.

To satisfy the subjective component, Truman must show that Dr. Smith "actually knew of and *ignored* [an inmate's] serious need for medical care." *Young v. City of Mt. Rainier*, 238 F.3d 567, 575–6 (4th Cir. 2001) (emphasis added). The treatment "must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990). The evidence provided by Dr. Smith establishes that Truman's discomfort was managed in a reasonable and timely manner by Dr. Smith and other ACC staff.[3] Dr. Smith was attentive, and his efforts to address plaintiff's needs were clearly documented. Dr. Smith examined Truman, reviewed and ordered diagnostic studies, and prescribed medication for his symptoms. The reasonableness of Dr. Smith's course of treatment is reinforced by the healthcare providers at Baskerville Correctional Center, who treated Truman after he left ACC and affirmed Dr. Smith's findings that Truman's condition was chronic and the result of arthritis, recommending a conservate course of treatment just like Dr. Smith.

In response to Dr. Smith's motion for summary judgment, Truman largely repeats the unsworn allegations of his complaint. For example, Truman claims that x-rays ordered by Dr. Smith show that his neck was damaged. (Dkt. No. 49 at 2; *see also* Compl. at 5.) However, the x-ray of his neck showed no acute injuries and only a chronic, pre-existing issue. (SA 028–029.) Truman claims that he should have been given a neck brace because "[a]ny doctor would give a patient with a damaged neck a brace to sleep with." (Dkt. No. 49 at 2–3.) Truman's disagreement with the treatment provided by Dr. Smith is not sufficient to create an issue of fact

---

[3] To the extent that Truman seeks to hold Dr. Smith liable for the actions or inactions of others, there can be no supervisory liability without an underlying constitutional violation. *See, e.g.*, *Doe v. Rosa*, Civil Action No. 2:14-4396-RMG, 2016 WL 7496162, at *4 (D.S.C. Feb. 8, 2016) ("A supervisory liability claim is intimately linked to and derivative of the underlying constitutional violation of a subordinate employee. In the absence of unconstitutional conduct by a subordinate, there can be no supervisory liability claim.") (citing *Temkin v. Frederick Cnty.*, 745 F.2d 716, 724 (4th Cir. 1991)).

for trial. *See Jackson*, 775 F.3d at 178 (explaining that the Fourth Circuit "consistently [has] found such disagreements to fall short of showing deliberate indifference").

For these reasons, Dr. Smith is also entitled to summary judgment.

### III. CONCLUSION

For the reasons stated herein, the court will issue an appropriate order addressing the pending motions.

Entered: March 24, 2024.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge